UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GARY D. STUBBLEFIELD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:09-CV-1072 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On October 6, 2006, plaintiff Gary D. Stubblefield filed applications for disabled adult child benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, (Tr. 94-97, 98-105), with an alleged onset date of June 1, 1962. After plaintiff's applications were denied on initial consideration (Tr. 39-43, 44-48), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 49).

The hearing was held via video conference on October 30, 2008. (Tr. 18-33). Plaintiff was represented by counsel. The ALJ issued a decision on January 13, 2009, denying plaintiff's claims. (Tr. 11-17). The Appeals Council denied plaintiff's request for review on May 7, 2009. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 54 years old. He attended the seventh grade.[1] (Tr. 21). He resided in Rolla, Missouri with a woman who owned rental property. (Tr. 30, 32). He had never served in the military or taken any online classes. (Tr. 21). He had been in jail twice "when [he] was a kid, just for little things." (Tr. 23). He had never been in prison. Id. He had never been hospitalized for alcohol or drug-related problems; he was never charged with driving under the influence. (Tr. 24).

Plaintiff's counsel informed the ALJ that plaintiff's physical impairments included: degenerative disc changes, osteopenia,[2] kidney stones, gall stones, pancreatitis, diabetes, and high cholesterol. (Tr. 24-26). He had a history of grand-mal seizures when he was a child; these stopped when he was 16 years old. (Tr. 26-27). He was not receiving treatment for seizures at the time of the hearing. (Tr. 27).

Plaintiff testified that he is able to drive but must stop every half hour to stretch his back and legs. (Tr. 29). He is able to help with grocery shopping, but does so very infrequently. (Tr. 30). He does very little yard work – it takes him three or four days to cut the grass with the push mower. He helps with the house work "a little bit," by helping to make the bed. Id. Plaintiff testified that on a

---

[1]The ALJ informed plaintiff that the Agency's records indicated that he had a GED plus vocational training. He denied that this was the case. (Tr. 21).

[2]Decreased calcification or density of bone. Stedman's Med. Dict. 1284 (27th ed. 2000).

typical day, he gets up, has coffee, takes his medication, eats, watches television, and takes a nap. Sometimes he takes his house mate to the shop. (Tr. 31).

In response to questions from the ALJ, plaintiff stated that he can stand for 15 minutes and sit for about 30 minutes. He did not believe he could walk a city block, because his left hip and leg become numb and collapse. (Tr. 31-32). If he exercises care in the manner of lifting, he can lift 20 to 30 pounds without hurting his back. (Tr. 32).

Plaintiff testified in response to a question from the ALJ that he had never been self-employed. (Tr. 21). The ALJ pointed out that this testimony contradicted a statement plaintiff once made to hospital personnel that he was self-employed. (Tr. 22). Plaintiff acknowledged that he lied in order to secure treatment – he thought that he would be turned away unless he could offer some ability to pay for care. Id. He also testified that he had worked "in security" for one night. Id. The ALJ confronted him with a form he had completed in which he indicated that he had never worked. The ALJ had counsel take plaintiff from the hearing room to advise him of the meaning of the oath he had taken at the outset of the hearing. (Tr. 22-23).

Plaintiff completed a Disability Report as part of his application. (Tr. 125-32). He listed the following disabling conditions: back injury, pancreatitis, diabetes, high cholesterol, and kidney and gall bladder problems. (Tr. 126). Plaintiff stated that these conditions began in 1962. Plaintiff reported that his only employment had been one three-day period in 1998 when he was employed to guard the set of a television commercial. (Tr. 127). Plaintiff stated that he had

injured his back falling out of a moving car when he was seven years old. The doctor who treated him died about ten years ago and plaintiff did not know how to get his medical records. (Tr. 132).

Plaintiff also completed a Function Report. (Tr. 133-40). He reported that his daily activities included eating meals, watching television, showering, and going to the post office. After lunch, he took a nap and watched television. He sometimes went to Wal-Mart. He checked his blood-sugar level. (Tr. 133). He indicated the back pain interrupted his sleep. (Tr. 134). He stated that he had no difficulty with personal care and did not need reminders to take care of grooming or take his medications. (Tr. 134-35). He made sandwiches and prepared cereal, but otherwise did not cook. When asked to explain why he did not prepare meals, he stated that his house mate "Bonnie . . . always does it." (Tr. 135). In response to questions about whether he did any house or yard work, plaintiff stated that he cut the grass a small amount at a time. Id. Plaintiff stated that he goes outside "most of the time" unless he feels unwell. (Tr. 136). He is able to drive, but finds it difficult to drive at night. He indicated that he had no impairments in his ability to pay bills, use a checkbook, or count change. Id. His interests and hobbies include watching television and fishing, but he had been fishing only twice during the last five years. (Tr. 137). In response to a question regarding things he liked to do with others, plaintiff wrote that he and Bonnie go out to eat a couple of times each week. He does not attend church, community centers, sports events, or social groups. (Tr. 137). He could not state how his social activities were affected by his conditions because his injuries occurred when

he was child.  He recalled that he had problems with his teachers when he was a child because his seizure medications often made him fall asleep in class. Otherwise, he had no difficulty getting along with others.  (Tr. 138).

Plaintiff described the following abilities as affected by his illnesses: lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, and seeing. He stated that he could walk a distance of about two blocks before needing to rest due to pain in his back and legs.  (Tr. 138).  He was able to stand for 15 to 20 minutes and sit for about 30 minutes without pain in his back or legs.  (Tr. 140). His attention was unimpaired and he was able to finish what he starts.  He needed help with written instructions because he is "not a good reader" due to his limited education.  He could follow spoken instructions well.  (Tr. 138).  He stated that he gets along well with authority figures and has no difficulties coping with changes in routine.  In response to a question about how well he handles stress, plaintiff wrote, "Good at times," but noted that he feels more stress as he gets older.  He never lost a job due to an inability to get along with others because he never had a job.  (Tr. 139).  In a section asking about assistive devices, plaintiff indicated that he wears glasses and uses a cane  when he experienced leg and back pain. Id.

Plaintiff completed a second Function Report on July 6, 2008.  (Tr. 155-62). In this report, plaintiff described Bonnie as his mother's friend and indicated his mother had passed away in early 2008.  His daily activities remained largely unchanged, but he was no longer preparing his own meals and he needed reminders to take his medication.  (Tr. 157).  With the exception of Bonnie, he did

not socialize with others. (Tr. 159). They went out to restaurants three or four times a week. Id. Plaintiff indicated that, in addition to the previously noted impact of his conditions on various abilities, he was now having trouble with his memory and using his hands. (Tr. 160). He stated that he could walk only "a couple hundred feet" before he had to rest for about five or ten minutes. Id. Plaintiff described himself as a loner and stated that he now worried how he would make it if something happened to Bonnie. (Tr. 161).

In the narrative portion of the Function Report, plaintiff wrote that he fell out of a car when he was child. Thereafter, he started having seizures. The cause of the seizures was never determined and the medications he took made him fall asleep in class. One teacher grabbed him by his hair and dragged him from his desk. His parents then took him out of school and he just stayed home. A friend of his mother's (Bonnie) offered to take him in when she got divorced, so plaintiff went to live with her. Plaintiff wrote that Bonnie was getting old and having difficulty paying for his food and medications. Plaintiff's mother used to contribute to his care but she had died. He stated that he would work if he could, but the pain in his back, legs and hands prevented him from being able to stand or sit for long. (Tr. 162).

### III. Medical Evidence

Plaintiff began receiving medical care from William David Myers, D.O., in 2002. No records of earlier medical care have been provided. Progress notes indicate that plaintiff received treatment for ear pain, sore throat, fever and chills on October 11, 2002; he returned on October 31, 2002, with complaints of chest

congestion. (Tr. 282). No additional treatment is noted until February 20, 2004, when plaintiff reported symptoms consistent with diabetes. Plaintiff was prescribed Avandaryl.[3] Id. On February 23, 2004, plaintiff reported that he felt better. (Tr. 281). On March 5, 2004, plaintiff reported that he had "visual problems." Id. On March 9, 2004, it was noted that plaintiff had high cholesterol; Lipitor was prescribed. He also complained that he was waking up a lot. (Tr. 280). On April 6, 2004, plaintiff reported that he had had a cough, nasal congestion, and body aches for three days. Bronchitis was diagnosed. On June 3, 2004, it was noted that plaintiff had a sore throat; the pain reliever Ultracet was prescribed, but there is no statement regarding why. Id.

On April 8, 2006, plaintiff was seen at the Phelps County Regional Medical Center complaining of abdominal pain. (Tr. 251-52). A CT scan of the abdomen indicated the presence of a nonobstructing stone in the left kidney, a complex cyst in the right kidney, several gallstones, indications of calcific prostatitis, a small right inguinal hernia, and degenerative changes of the spine with a vacuum disc at L5-S1. (Tr. 264).

On April 23, 2006, plaintiff was admitted to the Phelps County Regional Medical Center for emergency treatment of abdominal pain, which he rated at 8 on a 10-point scale.[4] (Tr. 235-36). He reported that he experienced bloating or

---

[3]Avandaryl is indicated as an adjunct to diet and exercise to improve glycemic control on adults with type II diabetes mellitus. See Phys. Desk Ref. 1356 (64th ed. 2010).

[4]On admission, plaintiff stated that he was self-employed and ran a taxi business. (Tr. 225).

swelling whenever he ate or drank. He also reported that he had not had a bowel movement since April 11th. (Tr. 241). A CT scan of the abdomen indicated a mass in the pancreas, gallstones, and a right renal cyst. (Tr. 233). Plaintiff reported that he had kidney stones 10 years earlier. (Tr. 224). He also reported unidentified chronic pain issues, for which he was prescribed Ultracet.[5] He was originally placed on Percocet,[6] which gave him headaches, and Dr. Myers switched him to Darvocet,[7] which appeared to cause abdominal distention, bloating, and constipation. Id. At discharge on April 27, 2006, plaintiff's diagnoses were gallstone ileus,[8] cholelithiasis,[9] renal lithiasis,[10] high cholesterol, a mass in the pancreas, prostatic calcification and vascular calcification. (Tr. 218).

Plaintiff was admitted to the Phelps County Regional Medical Center on an emergency basis on July 5, 2006. (Tr. 206-07). He reported that he was experiencing severe abdominal pain, with intermittent episodes lasting 10 to 15

---

[5]Ultracet is indicated for the short term (five days or less) management of acute pain. See Phys. Desk Ref. 1462-63 (60th ed. 2006).

[6]Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[7]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

[8]Obstruction of the small intestine caused by passage of a gallstone from the biliary tract into the small intestine. See Stedman's Med. Dict. 875 (27th ed. 2000).

[9]Gallstones. See Stedman's Med. Dict. 339 (27th ed. 2000).

[10]Kidney stones. See Stedman's Med. Dict. 1024 (27th ed. 2000).

minutes. He also reported that his legs had collapsed. Elsewhere, however, the record reflects that plaintiff denied having difficulty walking, joint stiffness, or muscle soreness. (Tr. 195). On examination, plaintiff's abdomen was distended. The clinical impression was acute pancreatitis. (Tr. 207).

Plaintiff was examined by Dr. Dana Voight, M.D., on July 6, 2006. Dr. Voight noted that he had previously treated plaintiff for ileus secondary to pain medications. (Tr. 196). Under the heading "Social History," Dr. Voight noted that plaintiff was married, lived with his spouse, and did not use tobacco, although nicotine addiction was listed under plaintiff's past medical history. Id. Plaintiff's diagnoses at discharge on July 11, 2006, were acute pancreatitis, cholecystitis,[11] nicotine addiction, diabetes mellitus, chronic constipation, and hypercholesterolemia.[12] (Tr. 192).

On August 27, 2004, plaintiff saw Dr. Myers and received a dressing on his right index finger for a puncture wound he had sustained two weeks earlier while using a screwdriver. (Tr. 279). On September 6, 2006, plaintiff reported that he had been experiencing lower back pain for a week. (Tr. 278). On October 12, 2006, plaintiff wanted to discuss switching from Ultracet to Vicodin; however, on November 8, 2006, he asked to switch back to the Ultracet. Id. On December 12, 2006, he complained of a headache and sinus drainage. (Tr. 312).

---

[11]Inflammation of the gall bladder. See Stedman's Med. Dict. 337 (27th ed. 2000).

[12]High cholesterol. See Stedman's Med. Dict. 339, 340 (27th ed. 2000).

-9-

On January 15, 2007, plaintiff reported that he had been rear-ended in a motor vehicle accident and complained of pain. The pain was still present on January 29, 2007. Id. An x-ray of the lumbar spine on January 30, 2007, indicated that the vertebral bodies and intervertebral disc spaces were unremarkable, except for narrowing of L5-S1 disc space and anterior osteophyte[13] formation at other levels. The posterior elements were intact and the sacrum and sacroiliac joints were normal. The clinical impression was mild degenerative changes at L5-S1. (Tr. 291).

Plaintiff appeared for office visits on February 15, February 23, March 2, May 1, May 8, June 4, July 3, August 7, September 6, and December 21, 2007, and January 23 and February 26, 2008, for lab tests and medication refills. (Tr. 304-11). He was treated for respiratory infection during this time. References to muscle spasm and limited range of motion first appeared on May 1, 2007. On March 28, 2008, plaintiff reported that he had not taken his medications for six to eight months. (Tr. 304). He was seen again on April 28, May 29, June 30, and July 30, 2008. (Tr. 303).

On October 6, 2008, Dr. Myers wrote a letter in support of plaintiff's application for disability. Dr. Myers stated that plaintiff was seriously injured as an eight year old when he fell from a moving car. He suffered a serious head injury and back injury and subsequent seizure disorder. The head injury led to poor school performance while the back injury led to degenerative disc disease of the

---

[13] A bony outgrowth or protuberance. See Stedman's Med. Dict. 1285 (27th ed. 2000).

lumbo-sacral spine. Dr. Myers also noted that plaintiff has diabetes and stated that he has never been able to work at any occupation due to a combination of his physical and mental disabilities and lack of education. Dr. Myers opined that plaintiff is permanently and totally disabled. (Tr. 323).

### IV. The ALJ's Decision

In the decision issued on January 13, 2009, the ALJ made the following findings:

1. Plaintiff attained the age of 22 on April 27, 1976.

2. Plaintiff had not engaged in substantial gainful activity since June 1, 1962, the alleged onset date.

3. Since June 1, 1962, plaintiff has had the following severe impairments: degenerative disc disease of the lumbar spine and diabetes mellitus.

4. Since June 1, 1962, plaintiff has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work , except he is limited to simple unskilled work, given his lack of education and apparent learning difficulties.

6. Plaintiff has no past relevant work.

7. Plaintiff was a younger individual at the time of the alleged onset date and is closely approaching advanced age.

8. Plaintiff has limited education and is able to communicate in English.

9. Transferability of work skills is not an issue because plaintiff has no past relevant work.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, he has been able to perform jobs that exist in significant numbers in the national economy.

11. Plaintiff was not under a disability, as defined in the Social Security Act, since June 1, 1962.

(Tr. 13-16).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's

impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;
2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

### B. Analysis

Plaintiff's allegations of error attack the ALJ's assessment of plaintiff's credibility and her determination of plaintiff's Residual Functional Capacity (RFC).

#### 1. The ALJ's Credibility Determination

"In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of

objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir.2002)). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

The ALJ found that the medical evidence did not support plaintiff's allegations regarding the intensity or persistence of his symptoms or their effect on his ability to work. First, she noted, there was no evidence in the medical record to support a finding that plaintiff sustained a back or head injury as a child or that he suffered from a seizure disorder. (Tr. 15). Indeed, the earliest medical evidence contained in the record is from 2002. Additionally, there was no evidence of a disabling impairment as an adult: x-rays revealed only mild degenerative disc disease. Plaintiff had not had an MRI study of his lumbar spine or undergone

surgery. There was no evidence that plaintiff's diabetes caused any functional limitations, severe complications, or organ damage. Plaintiff had gallstones, cholelithiasis, pancreatitis, and renal cysts, but there was no evidence that these were chronic conditions and Dr. Myers did not mention them as a basis for his opinion that plaintiff was disabled. The ALJ also noted that plaintiff had provided false information to the Phelps County Regional Medical Center with respect to his employment, and that there was a discrepancy between plaintiff's testimony that he had always been compliant with his medications and a notation in the record indicating that he had not taken his medication for several months. These discrepancies detracted from plaintiff's credibility. Finally, the ALJ examined plaintiff's activities of daily living and found them to be significant and inconsistent with his allegations of disabling pain and limitations. Plaintiff was able to mow the lawn, make beds, lift 20 to 30 pounds, drive an automobile, walk short distances, and go shopping. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)

The record shows that the ALJ properly considered the Polaski factors in assessing plaintiff's credibility.

2. **The ALJ'S RFC Determination**

The ALJ determined that plaintiff retained the RFC to perform light work.[14] Plaintiff asserts in conclusory fashion that this determination is not supported by substantial evidence.

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

An RFC assessment completed on December 22, 2006, concluded that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour day, sit for about 6 hours in an-8 hour day, had unlimited ability to push or pull hand controls, and occasionally climb and crouch.

---

[14]The Social Security regulations state:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

(Tr. 283-88). Plaintiff provided no other RFC determination and the ALJ had an adequate medical basis for her determination that plaintiff had the physical capacity to perform light work.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in the brief in support of his complaint [Doc. #10] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of July, 2010.